# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **SHARON HASBERRY,** | } | |
| | } | |
| **Plaintiff,** | } | |
| | } | |
| **v.** | } | **Case No.: 2:18-cv-547-MHH** |
| | } | |
| **ANDREW SAUL, Commissioner of** | } | |
| **the Social Security Administration,**[1] | } | |
| | } | |
| **Defendant.** | } | |

## <u>MEMORANDUM OPINION</u>

Pursuant to 42 U.S.C. § 405(g), plaintiff Sharon Hasberry seeks judicial review of a final adverse decision of the Commissioner of Social Security. The Commissioner denied Ms. Hasberry's claim for a period of disability and disability insurance benefits. After careful review, the Court remands the Commissioner's decision.

---

[1] The Court asks the Clerk to please substitute Andrew Saul for Nancy A. Berryhill as the proper defendant pursuant to Rule 25(d) of the Federal Rules of Civil Procedure. *See* Fed. R. Civ. P. 25(d) (When a public officer ceases holding office that "officer's successor is automatically substituted as a party."); *see also* 42 U.S.C. § 405(g) ("Any action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

# I. PROCEDURAL HISTORY

Ms. Hasberry applied for a period of disability and disability insurance benefits. (Doc. 6-3, p. 11; Doc. 6-6, p. 2). Ms. Hasberry alleges her disability began on June 4, 2014. (Doc. 6-3, p. 11; Doc. 6-6, p. 2). The Commissioner denied Ms. Hasberry's claim. (Doc. 6-4, pp. 8-11; Doc. 6-5, pp. 2-6).

Ms. Hasberry requested a hearing before an Administrative Law Judge (ALJ). (Doc. 6-5, pp. 7-10). (Doc. 6-3, p. 33). After the hearing, the ALJ issued an unfavorable decision. (Doc. 6-3, pp. 8-21). The Appeals Council declined Ms. Hasberry's request for review (Doc. 6-3, p. 2), making the Commissioner's decision final for this Court's judicial review. *See* 42 U.S.C. § 405(g).

# II. STANDARD OF REVIEW

The scope of review in this matter is limited. "When, as in this case, the ALJ denies benefits and the Appeals Council denies review," the Court "review[s] the ALJ's 'factual findings with deference' and [his] 'legal conclusions with close scrutiny.'" *Riggs v. Comm'r, Soc. Sec. Admin.*, 522 Fed. Appx. 509, 510-11 (11th Cir. 2013) (quoting *Doughty v. Apfel,* 245 F.3d 1274, 1278 (11th Cir. 2001)).

The Court must determine whether there is substantial evidence in the record to support the ALJ's factual findings. "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Crawford v. Comm'r, Soc. Sec. Admin.*, 363 F.3d 1155, 1158

(11th Cir. 2004). In evaluating the administrative record, the Court may not "decide the facts anew, reweigh the evidence," or substitute its judgment for that of the ALJ. *Winschel v. Comm'r, Soc. Sec. Admin.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (internal quotations and citation omitted). If substantial evidence supports the ALJ's factual findings, then the Court "must affirm even if the evidence preponderates against the Commissioner's findings." *Costigan v. Comm'r, Soc. Sec. Admin.*, 603 Fed. Appx. 783, 786 (11th Cir. 2015) (citing *Crawford*, 363 F.3d at 1158).

With respect to the ALJ's legal conclusions, the Court must determine whether the ALJ applied the correct legal standards. If the Court finds an error in the ALJ's application of the law, or if the Court finds that the ALJ failed to provide sufficient reasoning to demonstrate that the ALJ conducted a proper legal analysis, then the Court must reverse the ALJ's decision. *Cornelius v. Sullivan*, 936 F.2d 1143, 1145-46 (11th Cir. 1991).

## III. SUMMARY OF THE ALJ'S DECISION

To determine whether a claimant has proven disability, an ALJ follows a five-step sequential evaluation process. The ALJ considers:

(1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a residual functional capacity ("RFC") assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the claimant

can perform given the claimant's RFC, age, education, and work experience.

*Winschel*, 631 F.3d at 1178.

In this case, the ALJ found that Ms. Hasberry has not engaged in substantial gainful activity since June 4, 2014, the alleged onset date. (Doc. 6-3, p. 14). The ALJ determined that Ms. Hasberry suffers from the following severe impairments: degenerative disc disease with chronic cervical and lumbar pain, status post anterior cervical discectomy and fusion; right foot pain; and status post hammertoe repair. (Doc. 6-3, p. 14). The ALJ determined that Ms. Hasberry suffers from the following non-severe impairments: depression and migraines. (Doc. 6-3, p. 15). In his opinion, the ALJ did not address whether Ms. Hasberry has an impairment or a combination of impairments that meets or medically equals the severity of any of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1, but because the ALJ continued the sequential analysis beyond step three, he impliedly determined that Ms. Hasberry's impairments do not meet or equal the severity of a listed impairment. *Prince v. Comm'r, Soc. Sec. Admin.*, 551 Fed. Appx. 967, 969 (11th Cir. 2014) (citing *Hutchison v. Bowen*, 787 F.2d 1461, 1463 (11th Cir. 1986)).[2]

---

[2] In Ms. Hasberry's brief, she states: "At Step 3, the ALJ determined the Plaintiff did not have an impairment or combination of impairments that met or medically equaled any listing. (R. 14)." (Doc. 11, p. 4) (citing doc. 6-3, p. 15). The ALJ made no such finding on that page or anywhere else in his opinion. Like the Court, Ms. Hasberry seems to infer the finding. In *Hutchison*, the Eleventh Circuit wrote:

In light of Ms. Hasberry's impairments, the ALJ evaluated her residual functional capacity. The ALJ determined that through her date last insured, Ms. Hasberry had the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except she can stand for no more than 30 minutes at a time, and occasionally stoop and crouch. She should have no exposure to unprotected heights. She can handle frequently, bilaterally; and should perform no activities involving driving.

(Doc. 6-3, pp. 15-16) (footnote omitted).

Based on this RFC, the ALJ concluded that through the date last insured, Ms. Hasberry could not perform her past relevant work as a security officer. (Doc. 6-3, p. 18). The ALJ noted that Ms. Hasberry was 53 years old when she applied for disability benefits. A person who is that age "is defined as an individual closely approaching advanced age (20 CFR 404.1563)." (Doc. 6-3 p. 18). Relying on testimony from a vocational expert, the ALJ found that other jobs existed in the national economy that Ms. Hasberry could have performed, including hand packager, cashier, and laundry folder. (Doc. 6-3, pp. 20). Accordingly, the ALJ

---

[T]he record indicates that the ALJ reached the final two steps of the analysis when he determined that the appellant was unable to perform his past work and that he did have the residual capacity for at least light work. While Appendix 1 must be considered in making a disability determination, it is not required that the Secretary mechanically recite the evidence leading to her determination. There may be an implied finding that a claimant does not meet a listing. We thus consider it clear that the ALJ, in reaching the fourth and fifth steps of the disability analysis, implicitly found that appellant did not meet any of the Appendix 1 impairments.

*Hutchison*, 787 F.2d at 1463.

determined that Ms. Hasberry was not under a disability within the meaning of the Social Security Act at any time from June 4, 2014, the alleged onset date, through May 31, 2017, the date of the ALJ's decision.  (Doc. 6-3, p. 20).

## IV.  ANALYSIS

Ms. Hasberry appeals the ALJ's decision and maintains that the ALJ improperly evaluated her credibility under the Eleventh Circuit pain standard.  (Doc. 11, p. 5).  Ms. Hasberry contends that the objective medical evidence is consistent with her subjective complaints of pain, the ALJ improperly considered her activities of daily living without considering her limitations, and the ALJ improperly discounted the opinion of Dr. Richard Harris.  The Court agrees that the ALJ did not base his negative credibility finding on substantial evidence.  Consequently, the Court will remand this case for further development.

The Eleventh Circuit pain standard "applies when a disability claimant attempts to establish disability through his own testimony of pain or other subjective symptoms."  *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991); *Coley v. Comm'r, Soc. Sec. Admin.*, 771 Fed. Appx. 913, 917 (11th Cir. 2019).  When relying upon subjective symptoms to establish disability, "the claimant must satisfy two parts of a three-part test showing:  (1) evidence of an underlying medical condition; and (2) either (a) objective medical evidence confirming the severity of the alleged [symptoms]; or (b) that the objectively determined medical condition can reasonably

be expected to give rise to the claimed [symptoms]." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002) (citing *Holt*, 921 F.2d at 1223); *Chatham v. Comm'r, Soc. Sec. Admin.*, 764 Fed. Appx. 864, 868 (11th Cir. Apr. 18, 2019) (citing *Wilson*). If the ALJ does not demonstrate "proper application of the three-part standard[,]" reversal is appropriate. *McLain v. Comm'r, Soc. Sec. Admin.*, 676 Fed. Appx. 935, 937 (11th Cir. 2017) (citing *Holt*).

A claimant's credible testimony coupled with medical evidence of an impairing condition "is itself sufficient to support a finding of disability." *Holt*, 921 F.2d at 1223; *see Gombash v. Comm'r, Soc. Sec. Admin.*, 566 Fed. Appx. 857, 859 (11th Cir. 2014) ("A claimant may establish that he has a disability 'through his own testimony of pain or other subjective symptoms.'") (quoting *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005)). If an ALJ rejects a claimant's subjective testimony, then the ALJ "must articulate explicit and adequate reasons for doing so." *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002); *Coley*, 771 Fed. Appx. at 918. The district court must accept the claimant's testimony, as a matter of law, if the ALJ inadequately discredits it. *Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988); *Kalishek v. Comm'r, Soc. Sec. Admin.*, 470 Fed. Appx. 868, 871 (11th Cir. 2012) (citing *Cannon*).

When credibility is at issue, the provisions of Social Security Regulation 16-3p apply. SSR 16-3p provides:

> [W]e recognize that some individuals may experience symptoms differently and may be limited by symptoms to a greater or lesser extent than other individuals with the same medical impairments, the same objective medical evidence, and the same non-medical evidence. In considering the intensity, persistence, and limiting effects of an individual's symptoms, we examine the entire case record, including the objective medical evidence; an individual's statements about the intensity, persistence, and limiting effects of symptoms; statements and other information provided by medical sources and other persons; and any other relevant evidence in the individual's case record.

SSR 16-3p, 2016 WL 1119029, at *4. Concerning the ALJ's analysis when discrediting a claimant's subjective symptoms, SSR 16-3p states:

> [I]t is not sufficient . . . to make a single, conclusory statement that "the individual's statements about his or her symptoms have been considered" or that "the statements about the individual's symptoms are (or are not) supported or consistent." It is also not enough . . . simply to recite the factors described in the regulations for evaluating symptoms. The determination or decision must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms.

SSR 16-3p, 2016 WL 1119029, at *10.

In evaluating a claimant's reported symptoms, an ALJ must consider:

(i)  [the claimant's] daily activities;

(ii) [t]he location, duration, frequency, and intensity of [the claimant's] pain or other symptoms;

(iii) [p]recipitating and aggravating factors;

(iv) [t]he type, dosage, effectiveness, and side effects of any medication [the claimant] take[s] or ha[s] taken to alleviate . . . pain or other symptoms;

(v)  [t]reatment, other than medication, [the claimant] receive[s] or ha[s] received for relief of . . . pain or other symptoms;

(vi)  [a]ny measures [the claimant] use[s] or ha[s] used to relieve . . . pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and

(vii) [o]ther factors concerning [the claimant's] functional limitations and restrictions due to pain or other symptoms.

20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3); *Leiter v. Comm'r, Soc. Sec. Admin.*, 377 Fed. Appx. 944, 947 (11th Cir. 2010).

At her administrative hearing, Ms. Hasberry testified that she left her previous job in June of 2014 because she could not perform the standing and walking requirements of the position.  (Doc. 6-3, p. 46).  She stated that her feet were "the biggest thing that ke[pt her] from being able to work a full-time job." (Doc. 6-3, p. 38).  She testified that she had surgery on her right foot in the months prior to her 2017 hearing, that her foot was "still sore," and that she was "still getting around slowly."  (Doc. 6-3, p. 38).  She stated that she had had "a lot of trouble with both of [her] feet" and had had "multiple surgeries," but still was "not quite right."  (Doc. 6-3, p. 38).

At the hearing, Ms. Hasberry stated that she had cervical neck surgery, but her neck seemed worse than it was before the surgery because of the pain she was experiencing in her neck and shoulders.  (Doc. 6-3, pp. 38-39).  She explained that she could not hold her head down.  (Doc. 6-3, pp. 38-39).  Ms. Hasberry stated that

she has trouble gripping and holding things, and she probably cannot lift more than ten pounds. (Doc. 6-3, p. 39). She described daily continuous pain and "pulsing" in her hands that are like "pins moving . . . penetrating them inside my hands." (Doc. 6-3, pp. 39-40). Ms. Hasberry reported daily shoulder "issues" as well, particularly with her left shoulder, which make it difficult for her to raise her arm up and style her hair. (Doc. 6-3, p. 40). Ms. Hasberry also described incision pain and swelling secondary to surgery for breast cancer. (Doc. 6-3, pp. 40-41). She was taking medication in connection with her breast cancer diagnosis. (Doc. 6-3, p. 41).

Ms. Hasberry testified that she suffers from depression, which made her "not . . . able to get up and move." (Doc. 6-3, p. 41). She stated that medication for her depression "helps [her] to get by." (Doc. 6-3, pp. 41-42). Ms. Hasberry also reported that she experienced migraines "every couple months," but medication "makes it better." (Doc. 6-3, p. 42).

Ms. Hasberry stated that "just standing up will get [her] feet starting hurting," but she estimated that she could walk up to 15 minutes at a time and stand up to 30 minutes at a time. (Doc. 6-3 p. 43). She indicated that she can sit up to 30 minutes at a time before "it starts to radiate in the back." (Doc. 6-3 p. 43). Ms. Hasberry explained that she managed her pain by taking medication and lying down. (Doc. 6-3, p. 43). She testified that medication "help[ed] the neck," but it caused drowsiness, which caused her to have to lie down and take a nap. (Doc. 6-3, p. 44).

Ms. Hasberry testified that in an eight-hour workday she would lie down four to five hours, mostly due to the medication she takes, but the pain also contributes. (Doc. 6-3, p. 44). Ms. Hasberry explained that she drives twice weekly from her home in Fairfield, Alabama, either to her doctor in Montgomery or to the grocery store. (Doc. 6-3, p. 47). Like the ALJ, this Court takes judicial notice that it is about 100 miles from Fairfield, Alabama to Montgomery, Alabama. (Doc. 6-3, p. 17, n. 2). Ms. Hasberry reported that she could bathe, dress herself, and prepare her own food. (Doc. 6-3, pp. 51-52). No physician has placed lifting limitations on Ms. Hasberry. (Doc. 6-3, p. 49).

The ALJ concluded that Ms. Hasberry's impairments meet the first part of the pain standard, but the ALJ found that Ms. Hasberry's subjective complaints "concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record ..." (Doc. 6-3, p. 17). The ALJ found that the medical evidence was inconsistent with disability and that Ms. Hasberry's description of her symptoms was inconsistent with her daily activities. (Doc. 6-3, p. 17). The ALJ gave "little weight" to the opinion of Dr. Richard Harris, a non-treating physician. (Doc. 6-3, pp. 17-18). The ALJ noted that none of Ms. Hasberry's treating physicians had imposed restrictions on her. (Doc. 6-3, p. 17). The Court examines each finding in turn.

## A. Objective Medical Evidence

The ALJ found that, "in July 2015, the claimant underwent [an] anterior cervical discectomy and fusion. Follow up records indicate progress and improvement in symptoms (i.e., spine pain). X-ray results confirmed continuing progress." (Doc. 6-3, p. 14) (citation omitted).

Ms. Hasberry's medical records support the ALJ's finding that Ms. Hasberry healed well after her surgery in 2015, but the ALJ omitted from his opinion significant medical evidence relating to the pain that Ms. Hasberry experienced in the months and years following the surgery. Ms. Hasberry's "longitudinal record of [] treatment" for neck and back pain support her pain allegations. *See* SSR 16-3p, 2017 WL 5180304, at *7 ("Important information about symptoms recorded by medical sources and reported in the medical evidence may include . . . [a] longitudinal record of any treatment and its success or failure."); *Frizzell v. Astrue*, 487 F. Supp. 2d 1301, 1306 (N.D. Ala. 2007).

Dr. Jefferson Underwood was Ms. Hasberry's primary care physician. On June 5, 2015, Ms. Hasberry complained to Dr. Underwood of continuous neck and hand pain which started "a couple of months ago" and "appear[ed] to be worsening." (Doc. 6-11, pp. 9, 15). Ms. Hasberry complained that the pain was "moderate" in intensity but worsened with ambulation. (Doc. 6-11, p. 15). On examination, Dr. Underwood noted that Ms. Hasberry had limited range of motion in her cervical

spine and pain with both movement and palpation. (Doc. 6-11, p. 16). Ms. Hasberry reported that because of her neck pain, she experienced depression, arm numbness, radiating pain, and weakness in her arm. (Doc. 6-11, p. 15). She described her hand pain as a "moderate aching," but she said it seemed to be getting worse. (Doc. 6-11, p. 15). Dr. Underwood prescribed the nonsteroidal anti-inflammatory drug (NSAID) Zipsor. A June 10, 2015 MRI of Ms. Hasberry's cervical spine showed "C6-7 midline disc protrusion with moderate focal cord compression [and] [s]mall C3-4 and C4-5 disc protrusions with mild focal cord compression." (Doc. 6-11, p. 31).

Dr. Underwood referred Ms. Hasberry to Neurosurgery & Spine Associates of Central Alabama. During a visit on July 13, 2015, Ms. Hasberry described neck, hand, and finger pain and weakness over the previous 18 months. (Doc. 6-12, p. 13). In a patient history form, Ms. Hasberry reported pain in her neck, hands, and fingers which she rated a ten on the pain scale ("as bad as it could be"). (Doc. 6-12, pp. 29, 32). Dr. Robert Bradley examined her, reviewed the June 10, 2015 MRI, and diagnosed Ms. Hasberry with cervical stenosis with myelopathy. (Doc. 6-12, pp. 14, 16). Dr. Bradley scheduled Ms. Hasberry for an anterior cervical discectomy and fusion (ACDF) at C3-4, C3-5, C5-6, C6-7. (Doc. 6-12, p. 14). Dr. Bradley saw Ms. Hasberry again on July 27, 2015, and noted that she was about the same, with no new symptoms. (Doc. 6-12, p. 11). Ms. Hasberry completed a "Follow-up Patient History Sheet" on that date. In it, she reported continued pain in her neck which she

rated a ten on the pain scale. (Doc. 6-12, pp. 27-28). Dr. Bradley scheduled Ms. Hasberry for surgery the next day. (Doc. 6-12, p. 12).

Ms. Hasberry's medical records indicate that the surgery healed well, but the surgery did not relieve her pain. On August 24, 2015, Dr. Bradley noted that Ms. Hasberry's condition had deteriorated since her previous visit. (Doc. 6-12, p. 9). Ms. Hasberry completed a "Follow-up Patient History Sheet" in which she rated her pain a five to six on the pain scale. (Doc. 6-12, pp. 25-26). She noted that her pre-op neck pain had improved since surgery, but she complained of back soreness with spasms and right arm tightness. (Doc. 6-12, p. 9). Dr. Bradley noted parascapular tenderness on palpation and described Ms. Hasberry's cervical range of motion as "guarded." (Doc. 6-12, p. 9). X-rays showed satisfactory alignment and position of the bone plugs and instrumentation. (Doc. 6-12, p. 9). Dr. Bradley told Ms. Hasberry to increase her activity "as tolerated" and to increase her walking and neck movement. (Doc. 6-12, p. 10). Ms. Hasberry was to follow up with Dr. Bradley in three months. (Doc. 6-12, p. 10).

Two months later, on October 26, 2015, Ms. Hasberry complained to Dr. Bradley of "increased pain to her neck with associated frontal headaches" over the weeks preceding the October 2015 appointment. (Doc. 6-12, p. 7). Ms. Hasberry stated that her pain was "intermittent," occurring three or more times each week. (Doc. 6-12, p. 7). Dr. Bradley noted that Ms. Hasberry continued to have "limited"

cervical range of motion and significant left trapezius spasm with a couple of trigger points. (Doc. 6-12, p. 7). A cervical x-ray revealed "proper positioning and alignment of instrumentation and bone plugs at C3-4, 4-5, 5-6, 6-7." (Doc. 6-12, p. 8). Dr. Bradley prescribed neck exercises and increased activity as tolerated, and he directed Ms. Hasberry to report to the Center for Pain for a left cervical trigger point injection. (Doc. 6-12, p. 8).

On December 21, 2015, Ms. Hasberry completed a "Follow-up Patient History Sheet" and reported continued pain in her neck and back that she rated as six out of ten on the pain scale (moderate to severe). (Doc. 6-12, pp. 21-22). Dr. Bradley noted that Ms. Hasberry's "pain to her lower neck and between her shoulder blades has not improved." (Doc. 6-12, p. 5). Dr. Bradley also noted that previous treatments included trigger point injections which Ms. Hasberry reported "did not relieve the pain at all." (Doc. 6-12, p. 5). On examination, Ms. Hasberry had decreased range of motion in her neck and significant tenderness from C6-T7. (Doc. 6-12, p. 5). A lateral cervical spine x-ray done that day "continue[d] to show satisfactory alignment and position of the instrumentation and bone plugs. The fusions appear to be progressing well." (Doc. 6-12, p. 6). Dr. Bradley prescribed Zanaflex and physical therapy. (Doc. 6-12, p. 6).

On May 9, 2016, Ms. Hasberry reported to nurse practitioner Heather Wilson at Neurosurgery & Spine Associates of Central Alabama, complaining of "severe"

pain in her neck, spine, arms, hands, and shoulders "for the last few months." (Doc. 6-12, pp. 3, 19-20). By this point, Ms. Hasberry was experiencing stiffness and bilateral shoulder pain daily, which worsened with increased activity. (Doc. 6-12, p. 3). A cervical spine x-ray showed satisfactory alignment and position of the instrumentation and bone plug, and Ms. Wilson noted that the fusion appeared solid at C6-7. (Doc. 6-12, p. 4). On examination, Ms. Hasberry had adequate range of motion in her neck, with bilateral trapezius tenderness. (Doc. 6-12, p. 3). Her thoracic spine exam revealed mild T1-3 tenderness with no palpable deformity. (Doc. 6-12, p. 4). Ms. Hasberry's lumbar spine-range of motion was normal for her age, and there was no significant tenderness to palpation. (Doc. 6-12, p. 4). Ms. Hasberry's straight leg raise was negative bilaterally, and her extremities revealed no atrophy or obvious deformity with good range of motion. (Doc. 6-12, p. 4). Ms. Wilson recommended physical therapy and a follow up with Dr. Pirofsky. (Doc. 6-12, p. 4).

Dr. Pirofsky referred Ms. Hasberry to the Center for Pain Prattville. (Doc. 6-12, p. 56). Dr. Aaron Shinkle and nurse practitioner Jennifer Summersill of the Center for Pain treated Ms. Hasberry from December 21, 2016, through March 28, 2017. (Doc. 6-12, pp. 56-76). The ALJ alludes to these records in his opinion, noting only that they "document little more than routine follow up, symptomatic

treatment, and medication management as needed." (Doc. 6-3, p. 15). In fact, these records document Ms. Hasberry's severe and increasing pain.

On December 21, 2016, Ms. Hasberry went to the Center for Pain, complaining of pain in her back, neck, shoulder, and hand, and reporting that trigger point injections had given her "0% relief." (Doc. 6-12, p. 56). Ms. Summersill noted that "[t]he patient rates her pain as 10/10," and "[t]he pain is made worse with sitting, standing, walking, driving, exercise, sexual intercourse, and physical activity." (Doc. 6-12, p. 56). The December 2016 medical record states that Ms. Hasberry was "able to perform [activities of daily living] with the current treatment." (Doc. 6-12, p. 56). Ms. Summersill noted that trigger point injections were ineffective in relieving pain. (Doc. 6-12, p. 56). Ms. Hasberry had a reduced range of motion in her cervical spine and a positive Spurling test bilaterally. (Doc. 6-12, p. 58).[3] Ms. Hasberry was diagnosed with "Chronic pain syndrome" for which she would need "long term (current) use of opiate analgesic." (Doc. 6-12, p. 58). Ms. Hasberry was

_____

[3] Physicians use the Spurling test to diagnose cervical radiculopathy, otherwise known as a pinched nerve in the cervical spine. *See* healthline.com/health/spurling-test and healthline.com/health/radiculopathy (last visited Aug. 12, 2019).

The ALJ reported that Ms. Hasberry "had 'very good range of motion of every small, medium, and large sized joint of the upper and lower extremities on both sides of the body'" (Doc. 6-3, p. 15), but omitted reference to the cervical spine evidence. (*See also* Doc. 6-3, p. 17).

obese. (Doc. 6-12, pp. 58-59). Ms. Hasberry was prescribed the narcotic Norco. (Doc. 6-12, pp. 56, 59).

On January 18, 2017, Ms. Hasberry returned to the Center for Pain complaining of back and neck pain which she described as "sharp, aching, and stinging," and "radiating to the upper back and bilateral knees and bilateral hands." (Doc. 6-12, p. 60). Ms. Summersill noted that "[t]he patient rates her pain as 10/10," and that the pain had not improved since Ms. Hasberry's last visit. (Doc. 6-12, p. 60). Ms. Hasberry again had reduced range of motion and a positive Spurling test, but she was able to perform activities of daily living with medication. (Doc. 6-12, pp. 60, 62). Ms. Hasberry was prescribed ten milligrams of the narcotic Percocet, dosed at one-half of a tablet three times daily as needed, and Norco was eliminated from her medications. (Doc. 6-12, pp. 60, 63).

Ms. Hasberry saw Ms. Summersill again on February 13, 2017, March 15, 2017, and March 28, 2017. (Doc. 6-12, pp. 64, 68, 73). At each visit, Ms. Hasberry complained of lower back and neck pain, which she rated eight out of ten. (Doc. 6-12, pp. 64, 68). On February 13, 2017, Ms. Summersill increased the frequency of Ms. Hasberry's dose of Percocet from three times daily to four. (Doc. 6-12, p. 67). At her March 15, 2017 appointment, Ms. Summersill reported that "[t]he current medication is increasing function" and that Ms. Hasberry was able to perform activities of daily living with medication. (Doc. 6-12, p. 68). Ms. Summersill

increased Ms. Hasberry's Percocet to one whole tablet two or three times daily as needed. (Doc. 6-12, p. 71). An MRI dated March 17, 2017, revealed "[t]ransitional-type L5 vertebra with left-sided hemisacralization" and "[d]egenerative disc and facet changes throughout the lower lumbar spine . . . most pronounced at L3-L4." (Doc. 6-12, p. 72). At her last recorded visit on March 28, 2017, Ms. Hasberry reported that the plate in her neck caused swelling and difficulty breathing and swallowing. (Doc. 6-12, p. 73). Ms. Hasberry "complain[ed] mostly of pain in her tailbone and it makes it hard to sit down for long periods of time." (Doc. 6-12, p. 73). Ms. Summersill scheduled Ms. Hasberry for a steroid injection and continued her on Percocet at the same levels and frequency as her previous visit. (Doc. 6-12, p. 75).

The ALJ's opinion that Ms. Hasberry's cervical surgery caused her back pain to improve is undercut by the fact that for nearly two years after her surgery, Ms. Hasberry's physicians increasingly prescribed narcotics to treat pain. (Doc. 6-3, p. 14); *see Frizzell*, 487 F. Supp. 2d at 1307 (Commissioner erred in refusing to credit the plaintiff's pain evidence in part due to evidence of prescriptions for narcotic and anti-inflammatory pain medications with multiple refills). Because these records corroborate Ms. Hasberry's reports of pain, the ALJ should have addressed them. *See Robinson v. Colvin*, No. 5:12-CV-1954-AKK, 2014 WL 2214294, at *5 (N.D. Ala. May 28, 2014) (finding that it was unreasonable for the ALJ to rely on a

"snapshot" of treatment notes that showed improvement and ignore later notes outlining the reoccurrence of pain); *see also* SSR 16-3p, 2016 WL 1119029, at *6. ("Important information about symptoms recorded by medical sources and reported in the medical evidence may include, but is not limited to . . . change over a period of time (e.g., whether worsening, improving, or static)[.]").

Ms. Hasberry's records indicate not only a history of back pain but also a history of fibromyalgia. On August 1, 2016, Ms. Hasberry saw Dr. Sohrab Fallahi who diagnosed Ms. Hasberry with fibromyalgia. (Doc. 6-12, pp. 53-54). The ALJ noted that on October 3, 2016, Dr. Fallahi documented that Ms. Hasberry "'has [a] very good range of motion of every small, medium, and large sized joint of the upper and lower extremities on both sides of the body.'" (Doc. 6-3, p. 15) (quoting Doc. 6-12, p. 51). The ALJ overlooked Ms. Hasberry's complaints to Dr. Fallahi that she was "hurting all over her body, especially the shins" and that she had "soreness in the flesh around the joints and in the upper and lower parts of the back." (Doc. 6-12, pp. 51, 52). The Eleventh Circuit Court of Appeals has noted that "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision, so long as the ALJ's decision ... is not a broad rejection which is not enough to enable [a reviewing court] to conclude that the ALJ considered [the claimant's] medical condition as a whole." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal quotations and citations omitted). Still, an ALJ

"cannot pick and choose among a doctor's records to support his own conclusion." *Chambers v. Astrue*, 671 F. Supp. 2d 1253, 1258 (N.D. Ala. 2009). It was error for the ALJ to refer to one part of Dr. Fallahi's records without considering the records in their entirety.

Finally, in reviewing the treatment records, the ALJ noted, "no treating doctor has indicated that the claimant was disabled or otherwise unable to perform any work related activities." (Doc. 6-3, p. 17). The point is irrelevant because the issue of disability is reserved to the Commissioner. 20 C.F.R. § 404.1527(d)(1). Substantial evidence does not support the ALJ's finding that objective medical evidence demonstrated that Ms. Hasberry's back pain improved following her surgery in July 2015. Though images indicate healing in the cervical spine following the July 2015 surgery, Ms. Hasberry's 2017 MRI revealed degenerative changes in her lower back.

## B. Activities of Daily Living

In evaluating Ms. Hasberry's credibility, the ALJ also considered her daily activities, stating that:

> [s]he manages her personal care unassisted. She prepares meals, performs housework (laundry, dusting, dishes), is a licensed driver and drives up to 100 miles at a time, shops, handles finances, enjoys reading and watching television. She socializes with others on a daily basis, and has no difficulty following written or spoken instructions. In addition, the claimant reported that she could lift up to twenty pounds, which is consistent with more than sedentary abilities.

(Doc. 6-3, p. 17).

The ALJ may consider a claimant's daily activities when making a credibility finding. *See* 20 C.F.R. § 404.1529(c)(3) (listing "daily activities" as a relevant factor to consider in evaluating a claimant's subjective pain testimony). When examining daily activities, an ALJ must consider the record as a whole. *See Parker v. Bowen*, 793 F.2d 1177, 1180 (11th Cir. 1986) (faulting the Appeals Council's finding that claimant's "daily activities . . . have not been significantly affected" when the Appeals Council "ignored other evidence that her daily activities have been significant affected"). The Eleventh Circuit has recognized that "participation in everyday activities of short duration" will not prevent a claimant from proving disability. *Lewis v. Callahan*, 125 F.3d 1436, 1441 (11th Cir. 1997). Instead, "[i]t is the ability to engage in gainful employment that is the key, not whether a Plaintiff can perform chores or drive short distances." *Early v. Astrue*, 481 F. Supp. 2d 1233, 1239 (N.D. Ala. 2007); *see Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (claimant who "read[s], watch[es] television, embroider[s], attend[s] church, and drive[s] an automobile short distances . . . . performs housework for herself and her husband, and accomplishes other light duties in the home" still may suffer from a severe impairment).

Ms. Hasberry stated that she was able to bathe, dress herself, and prepare her own food. (Doc. 6-3, pp. 51-52). In a function report completed on April 4, 2015, she noted that she was doing laundry, dusting, and washing dishes. (Doc. 6-7, p.

24).  Ms. Hasberry explained that she was driving twice per week, either to her doctor in Montgomery or to the grocery store.  (Doc. 6-3, pp. 16-17; Doc. 6-3, p. 47).  She was shopping, was able to handle her finances, and enjoyed reading and watching TV.  (Doc. 6-7, pp. 25-26).  She spent time with others daily, and she could follow written and spoken instructions "very well."  (Doc. 6-7, pp. 26-27).

The ALJ overlooked evidence of the ways in which pain limited Ms. Hasberry's daily activities.  Ms. Hasberry stated that it was taking her longer to do her hair because she had trouble raising her arms.  (Doc. 6-3, pp. 23, 40).  The meals she prepared consisted of only "toast, [a] sandwich, [and] chips."  (Doc. 6-7, p. 24).  She stated that if she fried chicken, she had to sit down.  (Doc. 6-7, p. 24).  She stated that she cooked only "two or three days [per week]" and did not cook anything that required her to stand for long periods.  (Doc. 6-7, p. 24).  As far as doing laundry, dusting, and doing dishes, Ms. Hasberry explained that she did only "one thing every couple of days or once a week."  (Doc. 6-7, p. 24).  She shopped for food and clothing "two or three times a month [and] no more than 30 min[utes] to [an] hour."  (Doc. 6-7, p. 25).  She stated that she could not read or watch TV for long because her neck would start to hurt.  (Doc. 6-7, p. 26).  The failure of the ALJ to consider these limitations was error.  *See Bosarge v. Berryhill*, No. CA 16-0382-C, 2017 WL 1011671, at *7 (S.D. Ala. Mar. 15, 2017) (ALJ erred in "describ[ing] plaintiff's daily

activities in a manner which would lead the reader to believe that she performed them without any limitation.").

**C. The Report of Dr. Richard Harris**

On February 23, 2017, Dr. Richard Harris completed a "Medical Source Statement of Ability To Do Work-Related Activities." (Doc. 6-11, pp. 43-48). He noted that, due to her hand pain, Ms. Hasberry "occasionally" could lift and carry up to ten pounds, but never anything heavier than that. (Doc. 6-11, p. 43). He opined that Ms. Hasberry could sit or stand for only 30-45 minutes at a time, and walk for no more than 30 minutes at a time. (Doc. 6-11, p. 44). Dr. Harris stated that in an eight-hour day, Ms. Hasberry could sit for no more than two hours, stand for no more than one hour, and walk for no more than one hour. (Doc. 6-11, p. 44). Due to weakness in both hands, Dr. Harris wrote that Ms. Hasberry occasionally could reach, handle, finger, feel, and push/pull. (Doc. 6-11, p. 45). He stated that, because of back pain, she occasionally could use foot controls. (Doc. 6-11, p. 45). According to Dr. Harris, Ms. Hasberry's back pain prevented her from climbing ladders or scaffolds, and she could climb stairs, balance, stoop, kneel, crouch, and crawl only occasionally. (Doc. 6-11, p. 46). Dr. Harris wrote that due to the combination of Ms. Hasberry's knee, back, and arm pain, she could operate a motor vehicle or be exposed only occasionally to  humidity or wetness; dust, odors, fumes and pulmonary irritants; extreme cold; extreme heat; and vibrations. (Doc. 6-11, p. 47).

In Dr. Harris's opinion, Ms. Hasberry should never be around unprotected heights or moving mechanical parts. (Doc. 6-11, p. 47). Dr. Harris felt that Ms. Hasberry's back, arm, and knee pain prevented her from walking a block at a reasonable pace on rough or uneven surfaces, and that she could not use standard public transportation. (Doc. 6-11, p. 48).

Dr. Harris stated that the limitations he found have lasted, or would last, for 12 consecutive months. (Doc. 6-11, p. 48). He opined that Ms. Hasberry "could perform no more than sedentary work activities, and for no more than four hours daily." (Doc. 6-3, p. 15).

The ALJ gave "little weight" to this opinion and found that Ms. Hasberry could perform light work with restrictions. (Doc. 6-3, p. 17; Doc. 6-3, pp. 15-16). "The ALJ does not have to defer to the opinion of a physician [like Dr. Harris] who conducted a single examination, and who was not a treating physician." *Beegle v. Comm'r, Soc. Sec. Admin.,* 482 Fed. Appx. 483, 486 (11th Cir. 2012). Still, the ALJ's reason for rejecting Dr. Harris's opinion was that the opinion "was not consistent with [Ms. Hasberry's] treatment records and reports that confirm no medical restrictions and no significant limits secondary to pain." (Doc. 6-3, p. 17). As noted, substantial evidence does not support the ALJ's decision to discredit Ms. Hasberry's pain testimony, and the lack of restrictions in the record cannot be the sole basis for discounting Ms. Hasberry's complaints of pain. Accordingly, on

remand, after considering Ms. Hasberry's medical records in their entirety, the ALJ should reconsider the appropriate weight to give Dr. Harris's opinion.

## V.    CONCLUSION

The Court remands this matter for further administrative proceedings consistent with this memorandum opinion.

**DONE** this 8th day of January, 2020.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE